LIU, J.,
Concurring and Dissenting.—Defendant Calvin Dion Chism, a black man, was sentenced to death for the murder of Richard Moon, a white store clerk. At the first penalty phase, the jury hung 10 to two in favor of death. It is undisputed that the two holdouts were black women. In selecting the second penalty phase jury, the prosecutor exercised peremptory strikes against the first two black jurors available for challenge. When defendant challenged both strikes as racially motivated (see Batson v. Kentucky (1986) 476 U.S. 79 [90 L.Ed.2d 69, 106 S.Ct. 1712] (Batson); People v. Wheeler (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748] (Wheeler)), the prosecutor gave reasons for each strike. The trial court denied defendant’s motions, and this court now upholds the trial court’s rulings.
Today’s opinion marks the second time in 12 months that this court has rejected a claim of improper discrimination in jury selection despite indications in the record that the strike of a black female juror was substantially motivated by discriminatory intent. (See People v. Williams (2013) 56 Cal.4th 630, 698-699 [156 Cal.Rptr.3d 214, 299 P.3d 1185] (dis. opn. of Werdegar, J.) [“as to at least two African-American women called as prospective jurors, the prosecutor engaged in purposeful discrimination in exercising his challenges . . .”]; id. at p. 718 (dis. opn. of Liu, J.) [same].)
Prospective Juror J.S., the second black juror struck by the prosecutor, was a telephone circuit designer who worked her way up from a clerk position over a 30-year career at Pacific Bell. For the past 20 years, she had trained others on how to design circuits. She had two adult children as well as a 12 year old. She had previously served on a jury in a criminal case and in a civil case, both of which reached a verdict. At voir dire, she said she would be willing to vote for either death or life without parole, and that her decision would depend on the evidence. She said she would be willing to express her views and would be open to listening to others. She repeatedly said she would be willing to vote for the death penalty in an appropriate case.
In striking this juror, the prosecutor gave two reasons related to decision-making ability: (1) lack of supervisory experience in the workplace and (2) *1339 lack of experience handling stressful situations in life. The record reveals no support for the second reason, and the trial court refused a defense request to reopen voir dire specifically to examine whether J.S. had dealt with stressful situations in her life. As to the first reason, the record does not support the prosecutor’s characterization of J.S.’s position at Pacific Bell, and at least three seated white jurors had no supervisory role in their current jobs. Considering all relevant circumstances in the record before us, I find it difficult to conclude that the prosecutor’s strike of J.S. was not motivated in substantial part by improper discrimination. Accordingly, I dissent from that aspect of today’s decision.
I.
In Snyder v. Louisiana (2008) 552 U.S. 472 [170 L.Ed.2d 175, 128 S.Ct. 1203] (Snyder), the high court made clear that “ ‘[t]he Constitution forbids striking even a single prospective juror for a discriminatory purpose ....’” (Id. at p. 478.) Snyder, a capital case, focused on the strike of a single black juror, Jeffrey Brooks, whom the prosecutor described (1) as having a “ ‘nervous’ ” demeanor and (2) as possibly prone to convict the defendant of a lesser crime, thus avoiding a penalty phase, in order “ ‘to go home quickly’ ” and fulfill his obligations as a student teacher. (Ibid.) The high court refused to credit the first reason because “the record [did] not show that the trial judge actually made a determination concerning Mr. Brooks’ demeanor.” (Id. at p. 479.)
As to the second reason, Snyder concluded that it “fails even under the highly deferential standard” applicable on habeas corpus review. (Snyder, supra, 552 U.S. at p. 479; see id. at p. 478 [applying “clear error” standard].) The high court said the possibility that Mr. Brooks would vote to convict on a lesser offense in order to end the case quickly was “highly speculative.” (Id. at p. 482.) Further, the court found the strike “suspicious” because “the prosecutor anticipated on the record during voir dire” that the trial would be brief, because “Mr. Brooks’ dean promised to ‘work with’ Mr. Brooks to see that he was able to make up any student-teaching time that he missed due to jury service,” and because “the trial occurred relatively early in the fall semester,” thus giving Mr. Brooks “many weeks” to make up any lost teaching time. (Id. at pp. 482-483.) Finally, the court said “[t]he implausibility of this explanation is reinforced by the prosecutor’s acceptance of white jurors who disclosed conflicting obligations that appear to have been at least as serious as Mr. Brooks’.” (Id. at p. 483; see id. at p. 484 [comparing Mr. Brooks to two white jurors with “urgent” or “more pressing” work or family obligations].) In light of these circumstances, Snyder concluded that the prosecutor’s strike of Mr. Brooks was “motivated in substantial part by discriminatory intent.” (Id. at p. 485.)
*1340 As explained below, the prosecutor’s strike of J.S. in this case is no less suspicious than the strike of Mr. Brooks in Snyder.
A.
During voir dire on March 5, 2001, Prospective Juror J.S. introduced herself as a telephone circuit designer for Pacific Bell. She had graduated from high school and attended two years of college, studying business administration. While in school, she did clerical work at the Los Angeles County “Department of Justice” or “District Attorney’s Office.” At the time of voir dire, she had worked for Pacific Bell for 30 years, initially as “a clerk for awhile, and then I moved on up.” When asked whether she “ever supervised any employees,” J.S. said, “No. I do a lot of training.” J.S. proceeded to explain that for about 20 years, she had been training others on how to design circuits on a computer.
J.S. had previously served on a jury in a criminal trial and in a civil trial. In both instances, the jury reached a verdict. The criminal case concerned child molestation, and the civil case involved personal injuries. J.S. was divorced; her former husband was a plumber. She had two adult sons and a 12-year-old son, as well as three grandchildren.
On March 2, 2001, the court had asked J.S. about her views on the death penalty. J.S. said she would neither automatically vote for death nor automatically vote against death. When the court asked for her “general views on the death penalty,” J.S. said, “I would have to hear the evidence.” The court then asked, “So if you heard the evidence, and you were instructed on the law, if you were convinced that death was the appropriate penalty, you could vote for that?” J.S. replied, “Yes.” The court also asked, “If you were convinced that life without parole was appropriate, could you vote for that?” J.S. replied, “Yes.”
On March 5, 2001, in response to questions from the prosecutor, J.S. said she understood she would have to weigh each piece of evidence, to decide whether it was aggravating or mitigating, and to choose the appropriate penalty. At that point, the prosecutor asked, “With all that in mind, and understanding that before you’re asked to exercise your choice you will be presented evidence, do you feel that you would always choose life over death?” J.S. replied, “No.” The prosecutor then asked, “Do you feel the other way, that you would always choose death over life?” J.S. said, “No.” The voir dire continued; “[Prosecutor]: At this juncture, are you prepared, if in your mind you think death is an appropriate penalty, to come back with a verdict of death? [f] [J.S.]: Yes. [][] [Prosecutor]: You understand that’s what would be required if you think death is appropriate? [][] [J.S.]: Yes. [f] [Prosecutor]: You can do that? [][] [J.S.]: Yes.”
*1341 J.S. then gave the following answers to questions from defense counsel and the court: “[Defense counsel]: . . . [Y]ou can assure us that you will express your views and listen to others, right? [][] [J.S.]: Yes. . . . [ft] [Defense counsel]: In other words, if you have an opinion and the a [sic] majority disagrees with you, you will state your opinion? [ft] You won’t be a shrinking violet? [][] [J.S.]: No. [ft] [The Court]: You are not going to change your mind to accommodate some other people, are you? [f] [J.S.]: No. [ft] [Defense counsel]: By the same token, if you listen to them, you do believe that you might be right—you will be open to listening to them? [ft] [J.S.]: Yes. [ft] [Defense counsel]: And you understand that the final ultimate decision on your vote is your measuring stick, your opinion? [ft] [J.S.]: Yes. [1] [Defense counsel]: Both sides are entitled to that, correct? [ft] [J.S.]: Yes.”
The prosecutor exercised her fourth peremptory challenge against F.J., the first black juror available for challenge, and the trial court denied defendant’s Batson motion. On March 6, 2001, after the parties exercised additional strikes, the prosecutor struck J.S., who was the second black juror available for challenge. Defense counsel again objected. At sidebar, defense counsel observed that J.S. “seemed like an idea [szc] juror. She had two priors, both—one civil, one criminal. There was a verdict. She has worked for many, many, many years at Pacific Bell. Worked her way up. She supervised people. She trains. She obviously can make decisions. She worked—-and just otherwise seems to be a good juror, [ft] I can’t see any reason why the district attorney would not accept her, other than the fact she is a black female, [ft] And I would note that the last jury which hung, the two hangs were black females. But that should not be a basis.”
The court responded: “Of course, [the prosecutor] has relied on life’s experience criteria in the past, [ft] . . . [ft] This juror has trained people. I don’t recall that she supervised anybody. I believe she has trained people on how to use the computer design circuits.”
The prosecutor responded: “My recollection is that she specifically said she did not supervise anybody, [ft] From what I can glean from her job assignment is she’s got a very fancy, but misleading, job description, which she is basically, from my understanding, she is into data entry. She makes no decisions. She is given specifications and she inputs that information into a computer. She is basically a more sophisticated form of a filing clerk. And, basically, she’s held nothing but clerk positions. She has trained individuals in terms of inputting data. She is a data entry specialist, basically.
“I don’t think the fact she trains people in how they input data makes her specifically qualified for high-stress decision-making jobs. And that’s basically what this is. This is going to be a very stressful, deliberative process. It *1342 also requires individuals who are seasoned decision makers. They could handle the stress of a tough decision. [ft] . . . [ft]
“I’ve looked at her job description. She has basically been in clerk positions. If I were to not kick her, it seems to me that it would only be because she is an African American. And I don’t believe that I’m going to discriminate in one direction or the other. I’m not going to keep her simply because she is African American. I have confidence in the fact that good people with experience can be fair to an African American male.
“I don’t think that it is essential that an African American sit on the jury. I think it would be wonderful if we can find individuals who I feel are seasoned decision makers who can handle the stress of the situation. But there’s absolutely nothing about her background that tells me that she can operate in a high-stress situation. And that’s very important in this type of case where the issue is life and death. It’s going to be extremely stressful.”
At that point, the trial court said: “The D.A.’s comments have been non-solicited. I asked a prima facie showing, that prima facie showing has not been made.” Defense counsel disputed the prosecutor’s characterization of J.S.’s work experience and explained that J.S.’s long work history, experience as a trainer, and middle age (“she is at least in her 50s, probably older”) would make her a good juror. The court said, “Her position in the Department of Justice was filing,” and then added, “And I don’t necessary [sic] agree or disagree with the criteria that the D.A. is using as far as whether I would if I were a D.A., but that’s a non-race based criteria. And her use of the peremptory as to this juror was consistent with that non-suspect category use.”
After further argument by defense counsel, the prosecutor said, “But I want to add that it’s not just supervisory positions that I look for. I look for how they handled stressful situations or incidences in their life.” Defense counsel then asked, “May I inquire, this Juror was asked whether or not she has ever had to deal with stress in her life, specifically?” The court responded, “I don’t recall that specific question. But there were questions about her life.” At that point, defense counsel said, “There would be a request to reopen general voir dire on behalf of Mr. Chism so we can explore that possibility with [J.S.].” The prosecutor objected and, without disputing that J.S. had not been asked about stressful life experiences, said, “How a person deals with stress and how they recognize it as stress will vary from individual to individual. I know what I go on; their ability to deal with stress is one of the things I look at, including their ability to make decisions.” Without further analysis, the court said, “The voir dire was appropriately conducted. The request is denied.”
*1343 The only other identified black woman on the panel, M.G., was excused for cause because she said she would never impose the death penalty. In the end, the jury that made the penalty decision consisted of 11 white jurors and one black man, A.D., who was a former correctional officer and current correctional counselor with the federal Bureau of Prisons. A.D. had served on three juries, all of which reached a verdict. During his voir dire, the court said, “And I take it if there is a disturbance in the institution, it’s a stressful situation,” and asked whether A.D. “deal[t] with stress every day in [his] life.” A.D. answered in the affirmative. A.D. also noted that he was the union president, that he had had law enforcement and weapons training, and that he had friends in most law enforcement agencies.
B.
Although the trial court found no prima facie case of discrimination in denying defendant’s Batson motion with respect to J.S., today’s opinion properly concludes that “the trial court ruled ultimately that the prosecutor’s stated reasons were genuine and race neutral, and therefore ... the question whether defendant made a prima facie showing of racial discrimination is rendered moot.” (Maj. opn., ante, at p. 1314.) The question before us is whether an examination of “all of the circumstances” bearing on the prosecutor’s strike of J.S. reveals purposeful discrimination. {Snyder, supra, 552 U.S. at p. 478.) For several reasons, I believe it does.
First, the prosecutor struck J.S., a black juror, in a capital penalty trial where defendant was a black man convicted of murdering a white victim. We have noted the obvious relevance of this racial dynamic, as has the high court. (See People v. Taylor (2010) 48 Cal.4th 574, 608 [108 Cal.Rptr.3d 87, 229 P.3d 12] [“ ‘[Ajdequate inquiry into possible racial bias is . . . essential in a case in which an African-American defendant is charged with commission of a capital crime against a White victim.’ (People v. Holt (1997) 15 Cal.4th 619, 660 [63 Cal.Rptr.2d 782, 937 P.2d 213]; see also Mu’min v. Virginia (1991) 500 U.S. 415, 424 [114 L.Ed.2d 493, 111 S.Ct. 1899]....)”]; Wheeler, supra, 22 Cal.3d at p. 281 [“[T]he defendant need not be a member of the excluded group in order to complain of a violation of the representative cross-section rule; yet if he is, and especially if in addition his alleged victim is a member of the group to which the majority of the remaining jurors belong, these facts may also be called to the court’s attention.”]; Powers v. Ohio (1991) 499 U.S. 400, 416 [113 L.Ed.2d 411, 111 S.Ct. 1364] [“Racial identity between the defendant and the excused person might in some cases be the explanation for the prosecution’s adoption of the forbidden stereotype, and if the alleged race bias takes this form, it may provide one of the easier cases to establish both a prima facie case and a conclusive showing that wrongful discrimination has occurred.”].)
*1344 Second, in objecting to the prosecutor’s strike of J.S., defense counsel observed that the first penalty phase jury hung because two black female jurors refused to vote for death. On appeal, defendant quoted this observation in his briefing and mentioned it repeatedly at oral argument. The accuracy of the observation was never disputed by the prosecutor, the trial court, or the Attorney General on appeal. Moreover, neither the prosecutor, the trial court, nor the Attorney General ever disputed the prosecutor’s awareness that the two holdouts were black women. Plainly, the uncontested observation that two black female jurors refused to vote for death in the first penalty trial heightens the possibility that improper discrimination informed the prosecutor’s strike of J.S., the only death-qualified black woman on the panel.
Third, although today’s opinion says “the fact that the jury included an African-American ‘is an indication of good faith [by the prosecutor] in exercising peremptories’ ” (maj. opn., ante, at p. 1316), I am doubtful that much can be inferred from the prosecutor’s failure to strike seated Juror A.D., a correctional counselor with strong professional and personal ties to law enforcement. Given A.D.’s background, it would have been odd and clearly suspicious for the prosecutor to strike A.D.
Fourth, and most importantly, a review of the record casts doubt on the prosecutor’s stated reasons for striking J.S. In explaining the strike, the prosecutor took the view that a capital sentencing proceeding “requires individuals who are seasoned decision makers.” The prosecutor said that in selecting “individuals who I feel are seasoned decision makers who can handle the stress of the situation,” she considered two indicators: (1) “supervisory positions” in employment and (2) “how they handled stressful situations or incidences in their life.” According to the prosecutor, these were the criteria that motivated her to strike J.S. These reasons thus comprise the sole focus of our review. (See Miller-El v. Dretke (2005) 545 U.S. 231, 252 [162 L.Ed.2d 196, 125 S.Ct. 2317] (Miller-El) [“[W]hen illegitimate grounds like race are in issue, a prosecutor simply has got to state his reasons as best he can and stand or fall on the plausibility of the reasons he gives. A Batson challenge does not call for a mere exercise in thinking up any rational basis. If the stated reason does not hold up, its pretextual significance does not fade because a trial judge, or an appeals court, can imagine a reason that might not have been shown up as false.”].)
As to the first criterion, it is true that J.S. said during voir dire that she had not supervised any employees. The prosecutor was entitled to rely on this criterion as long as she applied it evenhandedly to all jurors, regardless of race. However, at least two white jurors, L.F. and K.K., who were already empaneled at the time the prosecutor struck J.S., also had no supervisory experience, and a third seated white juror, W.B., had no supervisory role in his current job and only a minor supervisory role in a previous job.
*1345 L.F. was an administrative assistant at Boeing who handled workers’ compensation and medical claims. During voir dire, the prosecutor asked L.F. about her job, as follows:
“[The prosecutor]: You make decisions as to whether or not claims will be approved or rejected?
“[L.F.]: No, ma’am.
“[The prosecutor]: What is [sic] your job duties with respect to that?
“[L.F.]: Pm a buffer between the injured worker and the insurance carrier. I do a lot of problem solving to eliminate that.
“[The prosecutor]: Your [sic] a facilitator?
“[L.F.]: Yes, uh-huh.
“[The prosecutor]: How long have you been engaged in that particular job assignment?
“[L.F.]: Probably off and on about 20 years at Boeing. [][] ...[!]
“[The prosecutor]: Do you work with other individuals on your job?
“[L.F.]: Yes.
“[The prosecutor]: Can you tell me about that?
“[L.F.]: We have workers’ comp and the leave of absence are in the same area. And so there is cross-training, [f] I have no decision making in what I do, but I can consult, of course, with other people on decisions to be made.”
“[The prosecutor]: Okay. [][] So if a problem arises that requires a decision, are you responsible for bringing it to somebody else’s attention?
“[L.F.]: Yes.
“[The prosecutor]: Do you also discuss pertinent information with that individual who would make the ultimate decision?
“[L.F.]: Sometimes.
“[The prosecutor]: Do you have some input?
*1346 “[L.F.]: Yes.
“[The prosecutor]: Apart from that, you basically facilitate the making of the claim and the processing of the claim?
“[L.F.]: Yes.”
K.K. was a lab technician at Raytheon, a position he had held for 15 years. The prosecutor asked K.K., “What specifically do you do?” K.K. replied, “Metallurgy and electronic failure analysis.” K.K. said he had an advanced degree in finance. When the prosecutor asked whether he “ever had to supervise employees,” K.K. said, “Basically, we’re self-helping each other, [f] . . . [|] A lot of the people that we work with, some of it’s on-the-job training, some of it’s working directly with engineers that give us instructions, so it depends on who needs help.” When the prosecutor asked whether he had held any other jobs, K.K. said, “Not since I’ve completed school, but I’ve been auto mechanic, house painter, whole bunch of different types of jobs I guess.”
A third seated white juror, W.B., was a network technician for Huntington Beach High School District. When the prosecutor asked him to describe his job, W.B. said, “It means computer system, computer network administration, computer troubleshooting.” When the prosecutor asked whether he supervised any employees, W.B. replied, “No. I do not.” W.B. went on to say that five years earlier, he “was in electrical wholesale, in sales and office management, that type of thing.” The prosecutor asked whether he supervised any employees while working in office management, and W.B. said, “Yes. Warehouse-type people.” The prosecutor then asked, “And what’s the maximum number of employees you supervised?” W.B. replied, “We had two, three, just sometimes temporaries.”
To the extent that the prosecutor looked for supervisory experience as a proxy for seasoned decisionmaking ability, a comparison of J.S. with L.F. is “particularly striking.” (Snyder, supra, 552 U.S. at p. 483.) As an administrative assistant handling workers’ compensation and medical claims, L.F. served as a “buffer” and a “facilitator.” She facilitated the making and processing of claims, and she brought problems, information, and input to others responsible for making decisions. But she said, “I have no decision making in what I do ... .” In addition, K.K., while having more advanced education than J.S., likewise had no supervisory role in his job as a lab technician. Further, W.B. had no supervisory role in his job as a network technician. The only supervisory experience W.B. mentioned was a job in office management five years earlier, in which he supervised two or three “[w]arehouse-type people” who were “sometimes temporaries.” In sum, *1347 nothing in the record indicates that J.S.’s job as a telephone circuit designer was less suggestive of seasoned decisionmaking ability than L.F.’s job as an administrative assistant, K.K.’s job as a lab technician, or W.B.’s job as a network technician or his prior job in office management. (See Miller-El, supra, 545 U.S. at p. 241 [“If a prosecutor’s proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination . . . .”].)
Today’s opinion speculates that “[t]he prosecutor may have reasonably viewed Juror L.F. as someone with experience in making decisions in stressful circumstances, and someone who would work well with other jurors as a team and return a verdict,” and that “[t]he prosecutor may have reasonably found that. . . [K.K.’s] ability to receive and give instructions to solve problems on a continuing basis demonstrated a strong ability to make decisions.” (Maj. opn., ante, at p. 1320.) But the record nowhere suggests that L.F. worked “in stressful circumstances.” Moreover, why would it not have been equally reasonable for the prosecutor to infer from J.S.’s work experience that J.S., like K.K., was engaged in problem solving on a continuing basis and, like L.F, would work well with others? J.S. appeared to be a valued employee at Pacific Bell, having been promoted over a 30-year career from a clerk position to training others on how to design telephone circuits. From J.S.’s job description, there was every reason for the prosecutor to infer that J.S. was experienced in problem solving and worked well with others.
Indeed, the prosecutor’s strike of J.S. after having accepted L.F., K.K., and W.B. appears even more suspicious in light of the prosecutor’s characterization of J.S.’s job. The prosecutor described J.S. as “a data entry specialist” who “makes no decisions” and “is given specifications and . . . inputs that information into a computer. She is basically a more sophisticated form of a filing clerk. And basically, she’s held nothing but clerk positions.” This minimization of J.S.’s work history is unsupported by the record. J.S. worked as a clerk while she was in school and began working as a clerk for Pacific Bell, but eventually moved up to her current role. Regarding the process of designing circuits, J.S. said, “We get an order, and then we have to put together the circuit, where it’s going from and where it ends up at.” J.S. never mentioned data entry, and the prosecutor did not ask whether J.S.’s job involved decisionmaking, problem solving, or technical expertise. As with L.F., K.K., and W.B., the prosecutor did not ask J.S. whether her job involved stressful situations. When defense counsel noted that the prosecutor’s characterization of J.S.’s work experience was unsupported by J.S.’s testimony, the trial court did not address the discrepancy. The court observed that J.S.’s *1348 “position in the Department of Justice was filing” but did not consider J.S.’s job as a circuit designer who trained others at Pacific Bell, a position she had held for 20 years.
As noted, the prosecutor gave a second reason in explaining her strike of J.S.: “. . . I want to add that it’s not just supervisory positions that I look for. I look for how they handled stressful situations or incidences in their life.” But this reason does not dispel the inference of discrimination because, as defense counsel objected at trial and as the record makes clear, J.S. was never asked about stressful situations in her life. The trial court said, “I don’t recall that specific question. But there were questions about her life.” The only questions asked about J.S.’s life, apart from her work history, concerned the makeup of her family and what activities she engaged in on a regular basis, to which J.S. said, “I take my son, my 12-year-old son, back and forth to basketball practice and his games and—[][] ... [][]... I don’t have time to do anything else.” Defense counsel asked the trial court to reopen voir dire specifically to examine whether J.S. had dealt with stressful situations in her life. But the prosecutor objected, and the trial court denied the request. Moreover, the prosecutor’s second reason could not have distinguished L.F., K.K., or W.B. from J.S. because nothing in the record addressed whether or how those jurors had dealt with stressful situations in their lives.
To sum up: The prosecutor struck J.S., a black woman, in selecting the jury for a capital penalty trial involving a black man convicted of murdering a white victim. It is undisputed that the first penalty phase jury hung with two black women as holdouts against a death verdict. Based on J.S.’s work experience, the prosecutor said J.S. was not a “seasoned decision maker[]” who “could handle the stress of a tough decision.” But J.S.’s work experience does not appear meaningfully different, as a proxy for decisionmaking ability, from the work experience of three seated white jurors, including an administrative assistant who said, “I have no decision making in what I do ... .” Further, although the prosecutor said she also “look[s] for how they handled stressful situations or incidences in their life,” this additional reason could not have explained the strike of J.S. because J.S. was never asked about stressful situations in her life. Considering the totality of relevant circumstances, I find it more likely than not that the prosecutor’s reasons for striking J.S. were pretextual. “The prosecution’s proffer of th[ese] pretextual explanation^] naturally gives rise to an inference of discriminatory intent.” (Snyder, supra, 552 U.S. at p. 485.)
II.
In reaching a contrary conclusion, today’s opinion reveals several dubious aspects of our Batson jurisprudence.
*1349 First, the court’s examination of defendant’s Batson claim, including its cursory comparative juror analysis, accords deference to the trial court’s ruling. (Maj. opn., ante, at pp. 1315, 1318.) But nothing in the record indicates that the trial court, in making its ruling, compared J.S. to white jurors whom the prosecutor did not strike. The trial court also did not examine discrepancies between J.S.’s testimony and the prosecutor’s account of J.S.’s job. Nor did the trial court reopen voir dire in light of the prosecutor’s claim that J.S. had not dealt with stressful situations in her life, even though the court acknowledged that J.S. had not been asked that question. Although deference is appropriate when the trial court has made “ ‘a sincere and reasoned effort to evaluate’ ” all relevant circumstances bearing on a Batson claim (People v. Lenix (2008) 44 Cal.4th 602, 614 [80 Cal.Rptr.3d 98, 187 P.3d 946] (Lenix)), it is unclear what exactly this court is deferring to here. (See People v. Mai (2013) 57 Cal.4th 986, 1062 [161 Cal.Rptr.3d 1, 305 P.3d 1175] (conc. opn. of Liu, J.).) On this record, the case for deference is especially weak because the prosecutor did not rely on J.S.’s demeanor or other intangible qualities apparent only to the trial court. This court, no less than the trial court, is capable of evaluating the prosecutor’s claims as to decisionmaking ability, as demonstrated by each juror’s employment or life experience.
Second, the court casts doubt on the utility of comparative juror analysis when conducted for the first time on appeal because “a party legitimately may challenge one prospective juror but not another to whom the same particular concern applies. [Citation.] ‘Two panelists might give a similar answer on a given point. Yet the risk posed by one panelist might be offset by other answers, behavior, attitudes or experiences that make one juror, on balance, more or less desirable. . . .’ [Citation.]” (Maj. opn., ante, at p. 1319.) Whatever the merits of this concern (cf. Miller-El, supra, 545 U.S. at p. 247, fn. 6 [rejecting “a rule that no comparison is probative unless the situation of the individuals compared is identical in all respects”]), it has no applicability here. That is because the prosecutor emphasized that the capital sentencing process, in her view, “requires individuals who are seasoned decision makers.” (Italics added.) In other words, the prosecutor’s reason for striking J.S. was a necessary quality she purportedly sought in any seated juror, whatever other qualities a juror might have. A comparative analysis that focuses specifically on this quality is thus probative of purposeful discrimination. (The court does not posit other qualities that distinguish L.F., K.K., or W.B. from J.S. in any event.) Moreover, the utility of such analysis does not require a large number of comparison jurors. In Snyder, the high court found it highly probative to compare a black juror struck by the prosecutor to just *1350 two seated white jurors. (Snyder, supra, 552 U.S. at pp. 483-484.) Here, as in Snyder, comparative juror analysis gives rise to a strong inference of discriminatory intent, even on a deferential standard of review. (Id. at p. 485; see Miller-El, supra, 545 U.S. at p. 241 [finding comparative juror analysis “[mjore powerful” than the fact that the prosecution struck 10 out of 11 black venirepersonsj.)
Third, the court says “[t]he basis for a challenge may range from ‘the virtually certain to the highly speculative’ [citation] and ‘even a “trivial” reason, if genuine and neutral, will suffice.’ [Citation.]” (Maj. opn., ante, at p. 1316.) But Snyder identified the “highly speculative” nature of the prosecutor’s stated reason as an indication of implausibility, giving rise to an inference of discriminatory intent. (Snyder, supra, 552 U.S. at p. 482.) Further, the court says the Batson inquiry focuses “ ‘on the subjective genuineness of the race-neutral reasons given for the peremptory challenge, not on the objective reasonableness of those reasons.’ ” (Maj. opn., ante, at p. 1317.) But we have also recognized that the prosecutor’s credibility can be measured by, among other factors, “ ‘how reasonable, or how improbable, the explanations are.’ ” (Lenix, supra, 44 Cal.4th at p. 613, quoting Miller-El v. Cockrell (2003) 537 U.S. 322, 339 [154 L.Ed.2d 931, 123 S.Ct. 1029].) Quite often, as in this case, an objective analysis of the reasonableness of the prosecutor’s explanation in light of the relevant circumstances in the record is the only basis for meaningful review of a Batson ruling.
Finally, today’s opinion makes new law that improperly limits comparative juror analysis. In this appeal, defendant contends that the prosecutor’s stated reasons for striking two black jurors are undermined by a comparison of those jurors not only to nonblack jurors already seated at the time the trial court ruled on the strikes, but also to nonblack jurors seated after the trial court’s rulings. The court holds that “if defendant believed the trial court should have considered any postruling developments, he could have, and should have, renewed his Batson/Wheeler claim. Because defendant did not, his reliance on the responses of the above jurors that were provided after the trial court denied his second motion is forfeited.” (Maj. opn., ante, at p. 1319.) This rule, the court says, follows from our statement in Lenix that “the trial court’s finding is reviewed on the record as it stands at the time the Wheeler/Batson ruling is made. If the defendant believes that subsequent events should be considered by the trial court, a renewed objection is required to permit appellate consideration of these subsequent developments.” (Lenix, supra, 44 Cal.4th at p. 624.)
*1351 But this statement in Lenix was dictum because Lenix involved no issue of “subsequent developments” urged for appellate consideration. The forfeiture rule announced today is in substantial tension with Lenix’s key holding with regard to consideration of comparative juror analysis when it is urged for the first time on appeal. In light of the obvious importance that Snyder and Miller-El assigned to comparative juror analysis, Lenix said that those cases “stand for the proposition that, as to claims of error at Wheeler/Batson’s third stage, our former practice of declining to engage in comparative juror analysis for the first time on appeal unduly restricts review based on the entire record. As the high court noted in Snyder, ‘In Miller-El v. Dretke, the Court made it clear that in considering a Batson objection, or in reviewing a ruling claimed to be Batson error, all of the circumstances that bear upon the issue of racial animosity must be consulted.’ (Snyder, [supra, 552 U.S.] at p. [478], italics added.) Thus, evidence of comparative juror analysis must be considered in the trial court and even for the first time on appeal if relied upon by the defendant and the record is adequate to permit the urged comparisons.” (Lenix, supra, 44 Cal.4th at p. 622, fn. omitted.)
Lenix thus holds that in reviewing a Batson ruling, an appellate court is not precluded from considering, and indeed must consider, grounds that the defendant did not bring to the trial court’s attention. The essential premise of this holding is that appellate review of a Batson ruling is not merely an exercise in evaluating the trial court’s performance based on arguments put forth by the parties. Instead, as Lenix said, Snyder and Miller-El require appellate courts to consider all relevant circumstances—to engage in “review based on the entire record”—in determining whether the strike of a particular juror was improperly motivated. (Lenix, supra, 44 Cal.4th at p. 622.) If jurors seated before a trial court’s ruling, but never brought to the court’s attention, must be considered in comparative juror analysis, then there is no reason why jurors seated after a trial court’s ruling may be considered only if the defendant makes a renewed objection. Any juror accepted by the prosecutor is a potentially relevant basis for comparison in determining whether a particular strike was discriminatory.
Although I agree that comparing the struck jurors to jurors seated after the trial court’s ruling does not aid the Batson claim in this case (maj. opn., ante, at pp. 1321-1322), this is not always so. In People v. Manibusan (2013) 58 Cal.4th 40 [165 Cal.Rptr.3d 1], the prosecution exercised its first peremptory strike against a black female juror whose only prior service on a jury had resulted in a hung jury. Among the reasons offered for the strike, the prosecutor said, “ T have an absolute policy of getting rid of people whose only jury experience resulted in a hung jury.’ ” (Id. at p. 108 (conc. & dis. opn. of Liu, J.).) But after the trial court denied the defendant’s Batson motion, the prosecutor repeatedly accepted two jurors whose sole experience on a jury had resulted in a hung jury. “The prosecutor’s ‘absolute policy,’ it *1352 turns out, was not absolute at all.” (Ibid.) Today’s decision requires us to ignore such obviously relevant circumstances in evaluating a Batson claim.
As a practical matter, the court has put the bar on notice that any reasonably competent defense attorney must reassert all Batson challenges at the end of jury selection, even though counsel need not bring any comparative juror analysis to the trial court’s attention in order to preserve the entire record for appeal. (See Lenix, supra, 44 Cal.4th at p. 622 [“evidence of comparative juror analysis must be considered . . . even for the first time on appeal if relied upon by the defendant and the record is adequate to permit the urged comparisons”].) The peculiarity of this result should be a tipoff that something is amiss. Under Snyder, Miller-El, and Lenix, our duty to consider all relevant circumstances in evaluating a Batson claim does not depend on counsel’s compliance with such an empty exercise.
III.
Today’s decision extends this court’s extraordinary track record of denying Batson claims. (See People v. Harris (2013) 57 Cal.4th 804, 885, 892-898 [161 Cal.Rptr.3d 364, 306 P.3d 1195] (conc. opn. of Liu, J.) [documenting this court’s rejection of Batson claims in 101 out of 102 cases presenting the issue over the past two decades, with People v. Silva (2001) 25 Cal.4th 345 [106 Cal.Rptr.2d 93, 21 P.3d 769] (Silva) as the sole exception].) Our Batson jurisprudence—especially its reflexive deference to trial court rulings and its refusal to infer discrimination from disparate treatment of similarly situated jurors—leaves one to wonder whether any circumstances, short of an outright admission by the prosecutor (see Silva, at p. 375), will ever suffice to prove a violation.
Prospective Juror J.S. was a mother of three who advanced over a 30-year career into a technical job in which she trained others. She had twice served on a jury that reached a verdict. She repeatedly said she would consider the evidence, would speak her mind and listen to others, and would be willing to vote for the death penalty in an appropriate case. J.S. appeared to be a well-qualified juror, no less qualified than several white jurors whom the prosecutor accepted. In this penalty retrial of a black man convicted of murdering a white victim, in which it is undisputed that the first penalty phase jury hung with two black women refusing to vote for death, the prosecutor’s strike of J.S. was not credibly explained by the reasons the prosecutor gave. Under the laws of this state, defendant may well deserve the death penalty in the eyes of a reasonable jury. But the jury must be one selected free of improper discrimination.
*1353 I join the portion of the court’s opinion affirming defendant’s convictions. But I respectfully dissent from the court’s affirmance of the penalty verdict.